UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TREVOR AARONSON**, | |
| Plaintiff, | |
| v. | Case No. 1:24-cv-03235 (TNM) |
| **DEPARTMENT OF JUSTICE**, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

This case raises a hodgepodge of issues under the Freedom of Information Act.
Trevor Aaronson is an investigative journalist looking into the Federal Bureau of Investigation's
alleged impersonation of the media.  He submitted a FOIA request asking the FBI for various
records on that subject.  Unsatisfied with the agency's response, Aaronson sues to force the FBI
to disclose more records.  Having reviewed the parties' cross-motions for summary judgment,
the Court grants each in part and denies each in part.

**I.**

Trevor Aaronson is a Florida-based investigative journalist.  Compl., ECF No. 1, ¶ 3.
He describes himself as having "extensively reported on the FBI's media impersonation tactics."
Pl.'s Mot. Summ. J., ECF No. 16-1, at 8.  One of his current investigations focuses on "whether
the FBI has set up . . . fake film companies to investigate a Second Amendment activist and his
nonprofit organization."  *Id.*

To that end, Aaronson submitted a July 2024 FOIA request to the FBI.  That request
sought 28 categories of records that can be further sorted into three buckets.  Requests 1 and 2
(the "Getwitz Requests") demanded "[a]ll emails in the FBI's classified and unclassified email

systems to, from, copying, or blind copying any email address ending in @getwitz.com, from

January 1, 2020 to present." Compl. ¶ 9. In Requests 3 and 4 (the "Contract Requests"),

Aaronson asked for all contracts between the FBI and two entities. *Id.* Meanwhile, Requests 5

through 28 (the "Longbow Requests") targeted records referring to various (allegedly fake)

production companies and film crews. *Id.* Along with "[a]ll emails in the FBI's classified and

unclassified email systems" and "all records in the Central Records System," those requests also

sought "[a]ll communications sent to the Undercover Review Committee ('UCRC') notifying it

of the approval of the FBI's representing, posing, or claiming to be a member of" various

documentary film crews. *Id.* And three of the Longbow Requests—items 5, 27, and 28—

demanded records mentioning the name "Brent Tyler," which Aaronson believes to be "a

pseudonym for a member of the FBI," as well as communications with

"brent@longbowriverproductions.co.uk" and a phone number. *Id.*

The FBI's response varied by batch. The agency denied the Getwitz Requests for failing

to comply with 28 C.F.R. § 16.3(b), informing Aaronson that they were "overly broad" and

would require an "[un]reasonable amount of effort." Hammer Decl., ECF No. 15-3, ¶ 10; *see* 28

C.F.R. § 16.3(b) ("Requesters must describe the records sought in sufficient detail to enable

Department personnel to locate them with a reasonable amount of effort.").

At first, the FBI replied similarly to the Contract Requests, claiming that they were "too

vague" and thus prevented it from "locat[ing] records with a reasonable amount of effort."

Hammer Decl. ¶ 11. But later the agency conducted a search. The FBI told Aaronson that it

would need one of three identifying numbers to search for the relevant contracts. *Id.* ¶¶ 31–32.

After Aaronson submitted an identifier for one of the entities involved in the Contract Requests,

the FBI performed a search that yielded no responsive records. *Id.* ¶¶ 33–34.

Finally, the FBI responded to the Longbow Requests in two ways.  As to Numbers 5, 27,

and 28, the agency made a so-called *Glomar* response:[1]  It asserted "that merely acknowledging

the existence or non-existence of records responsive to [those requests] would trigger harm under

FOIA Exemptions 6 and 7(C)."  *Id.* ¶ 38.  The FBI justified its *Glomar* response by maintaining

that Aaronson's three requests called for "information regarding one or more third parties."

*Id.* ¶ 7.  For the other Longbow Requests—6 through 26—the agency "conducted a main and

reference entry records search of the Central Records Systems . . . per the FBI's standard policy."

*Id.* ¶ 9.  That search uncovered no responsive records, so the FBI closed the request.  *Id.*

After filing an administrative appeal, Aaronson filed suit here.[2]  His FOIA Complaint

challenges the FBI's response to all his requests.  Compl. ¶¶ 33–47.  Aaronson wants the Court

to "order [the FBI] to conduct a search reasonably calculated to identify all records responsive to

[his] Request and to immediately disclose" those records.  *Id.* at 9.  The parties have cross-

moved for summary judgment, and their motions are now ripe.[3]

## II.

To obtain summary judgment, a movant must show that "there is no genuine dispute as to

any material fact" and that he "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The Court credits the nonmovant's factual allegations and draws all reasonable inferences in his

favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "The vast majority of

---

[1] The moniker comes from the *Glomar Explorer* Project, "a classified CIA program supposedly undertaken to raise a sunken Soviet submarine from the floor of the Pacific."  *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981).  A *Glomar* response is proper "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption."  *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

[2] The agency closed Aaronson's administrative appeal after he sued.  Hammer Decl. ¶ 15.

[3] Aaronson also requested a motion hearing.  The Court concludes that the parties' briefing properly addresses the issues and thus makes oral argument unnecessary.  *See* LCvR 7(f) (stating that the decision whether to hold a motion hearing "shall be within the discretion of the Court").

FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011) (cleaned up).

FOIA exposes "agency action to the light of public scrutiny." *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 772 (1989) (cleaned up). The statute requires an agency to release records not otherwise exempt from disclosure when it receives a request that "reasonably describes such records." 5 U.S.C. § 552(a)(3)(A). An agency responding to a FOIA request "must conduct a search reasonably calculated to uncover all relevant documents and, if challenged, must demonstrate beyond material doubt that the search was reasonable." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (cleaned up). The agency can carry its burden with an affidavit "show[ing], with reasonable detail, that the search method . . . was reasonably calculated to uncover all relevant documents." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). An agency claiming a FOIA exemption bears the burden of showing the exemption applies to the withheld information. *See ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011).

## III.

This dispute boils down to three main issues. The first is whether the FBI properly denied Aaronson's Getwitz Requests for being unduly burdensome. Pl.'s Mot. Summ. J. at 21–25; Defs.' Mot. Summ. J., ECF No. 15-1, at 11–13. The second addresses whether the FBI performed an adequate search for items 6 through 26 of the Longbow Requests. Pl.'s Mot. Summ. J. at 26–31; Defs.' Mot. Summ. J. at 15–17. And the third requires the Court to decide whether the FBI was justified in its *Glomar* response to items 5, 27, and 28. Pl.'s Mot. Summ. J. at 31–38; Defs.' Mot. Summ. J. at 17–19. The Court rules for the FBI on the first issue. As to

the second, the Court holds that the FBI's search was inadequate in one respect.  And on the third

issue, the Court concludes that the agency did not properly sustain its *Glomar* response.

But before examining those contested issues, the Court can dispose of one that is not.

Recall that the FBI conducted a search for Aaronson's Contract Requests (items 3 and 4) after

Aaronson provided more information.  *Supra* at 2.  The FBI argues that the search was adequate,

Defs.' Mot. Summ. J. at 13–15, and Aaronson "does not challenge" that assertion, Pl.'s Mot.

Summ. J. at 9 n.1.  Given Aaronson's concession and the Court's independent finding that the

FBI's search method was "reasonably calculated to uncover all relevant documents," *Oglesby*,

920 F.2d at 68, the Court rules in the FBI's favor on this point.  *See Comptel v. FCC*, 945 F.

Supp. 2d 48, 55 (D.D.C. 2013) ("Where a party fails to address arguments raised by the opposing

party's motion for summary judgment, the Court may treat those arguments as conceded."

(collecting cases)).

The Court now turns to the three bones of contention.

### A.

Start with burdensomeness.  To recap, Aaronson's Getwitz Requests demanded "[a]ll

emails in the FBI's classified and unclassified email systems to, from, copying, or blind copying

any email address ending in @getwitz.com, from January 1, 2020 to present."  Compl. ¶ 9.  The

FBI argues that those requests deserved denial because they were too burdensome.  Defs.' Mot.

Summ. J. at 11–13.  The Court agrees.

This implicates one of FOIA's more rarely invoked thresholds.  In the mine run of FOIA

cases, agencies must disclose material upon request unless that material "fall[s] within one of

nine enumerated exemptions." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267

(2021) (citing 5 U.S.C. § 552(b)).  "Most FOIA cases therefore proceed in a predictable

fashion": "A member of the public submits a request; the agency searches for and locates responsive documents; and the agency releases all material in those documents not exempt from disclosure." *Ctr. for Immigr. Stud. v. USCIS*, 628 F. Supp. 3d 266, 270 (D.D.C. 2022).

"But that is not the full FOIA story." *Id.* FOIA's machinery kicks into gear only if the request meets certain conditions. *See* 5 U.S.C. § 552(a)(3). One hurdle is that a FOIA request must "reasonably describe[]" the records sought. *Id.* § 552(a)(3)(A); *see also* 28 C.F.R. § 16.3(b) (stating that a FOIA requester must "describe the records sought in sufficient detail to enable Department [of Justice] personnel to locate them with a reasonable amount of effort"). A request does so when it "would be sufficient [to] enable[] a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort." *Truitt*, 897 F.2d at 545 n.36 (cleaned up). In determining a request's scope, the agency is "bound to read it as drafted, not as either agency officials or [the requester] might wish it was drafted." *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984).

A request can flunk the "reasonably describes" proviso in various ways. *See Ctr. for Immigr. Stud.*, 628 F. Supp. 3d at 271–72. The first is vagueness: when imprecise wording prevents agency staff from "determin[ing] precisely what records are being requested." *See Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (cleaned up). For example, this Court has rejected a request that sought all documents "referencing or regarding in any way" eight topics about immigration at the southern border, which left agency staff "in a hopeless muddle without clear guidance about what documents" the requester wanted. *Am. Ctr. for L. & Just. v. DHS*, 573 F. Supp. 3d 78, 85 (D.D.C. 2021); *see also CNN v. FBI*, 271 F. Supp. 3d 108, 112 (D.D.C. 2017) (dismissing as "too vague" a request for records that "relate in any way" to memos issued by the FBI Director).

6

Second, an agency need not respond to a request—whatever its wording—that would require "an unreasonably burdensome search." *Goland v. CIA*, 607 F.2d 339, 353 (D.C. Cir. 1978); *accord AFGE v. Dep't of Com.*, 907 F.2d 203, 209 (D.C. Cir. 1990). That test hinges on whether agency employees can locate responsive records "with a reasonable amount of effort." *See Truitt*, 897 F.2d at 545 n.36. It is the agency's burden to "provide sufficient explanation as to why such a search would be unreasonably burdensome." *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995).

The D.C. Circuit held that the CIA met that burden where the request asked for "all [CIA] records pertaining to the IBM supercomputer named Watson." *Nat'l Sec. Couns. v. CIA*, 969 F.3d 406, 409 (D.C. Cir. 2020) (cleaned up). After all, honoring that request would have required a search of "every [agency] office for any documents containing the word Watson"—a "massive undertaking" that surpassed the agency's FOIA obligation. *Id.* at 410 (cleaned up); *see also, e.g.*, *Am. Ctr. for L. & Just.*, 573 F. Supp. 3d at 86–87 (holding unreasonably burdensome a request for all records "sent from, prepared by, sent to, received by, reviewed by, or in any way communicated to or by the DHS Secretary and his aides, staff, representative or agents, or acting predecessor, or any other CBP, ICE, or USCIS official" (cleaned up)). Courts must carefully police this line, recognizing that unwieldy nonprofit FOIA requests not only overwhelm agencies' abilities to respond to other FOIA requests but also put the U.S. taxpayer on the hook for their inevitable significant costs. *See id.* at 83–84 (describing FOIA litigants' "mismatched incentives").

Here too, the FBI has established that responding to the Getwitz Requests would be unreasonably burdensome. The agency explains that its "email communications are stored within the individual email accounts of FBI employees." Hammer Decl. ¶ 47. Most of the FBI's

roughly 38,000 employees have two email accounts—one classified, the other unclassified.  *Id.*

¶¶ 47, 49.  Searching for all email communications between the FBI and addresses ending in

@getwitz.com over a four-and-a-half-year period would thus require combing through more than

70,000 email accounts.  *See id.* ¶ 49.  On top of that, "the FBI would have to conduct a

considerable amount of research to determine which personnel separated from the FBI and which

personnel joined the FBI [over that period] to ensure [that the] emails of all FBI personnel were

accounted for and searched."  *Id.*  This would be a "massive undertaking"—one that FOIA does

not require.  *See Nat'l Sec. Couns.*, 969 F.3d at 410; *see also, e.g.*, *Keeping Gov't Beholden, Inc.*

*v. DOJ*, No. CV 17-1569 (FYP), 2021 WL 5918627, at *6 (D.D.C. Dec. 13, 2021) (finding

unduly burdensome a FOIA request "for all e-mail correspondence between the [National

Archives and Records Administration] Archivist assigned to the FBI and all FBI employees"

because it "would [have] require[d] the agency to search over 73,000 e-mail accounts"), *aff'd*

*sub nom. Brody v. DOJ*, No. 22-5043, 2023 WL 1511679 (D.C. Cir. Feb. 3, 2023).

Aaronson challenges the FBI's claim that it would need to search each email account

individually.  Instead, he says there is a shortcut:  "[T]he FBI can perform bulk, backend

searches of its classified and unclassified email systems through its existing IT and e-discovery

capabilities."  Pl.'s Mot. Summ. J. at 23.  The problem for Aaronson is that he fails to back up

that assertion.  He cites three FBI declarations from other cases, but those declarations suggest at

most that the FBI can search individual email accounts for specific keywords.  *See id.* at 23–24.

Without more, Aaronson cannot overcome the "presumption of good faith" that the FBI's

reasonably detailed affidavit deserves.  *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200

(D.C. Cir. 1991); *accord Shapiro v. DOJ*, 944 F.3d 940, 943 (D.C. Cir. 2019).  Because the

Getwitz Requests would have demanded "an unreasonably burdensome search," the agency was not required to respond. *See Goland*, 607 F.2d at 353.

## B.

Next consider adequacy. When an agency receives a valid FOIA request, it "must conduct a search reasonably calculated to uncover all relevant documents." *Truitt*, 897 F.2d at 542 (cleaned up). The agency need not "search every record system" or track down every record. *Oglesby*, 920 F.2d at 68. Perfection is not required. Instead, adequacy amounts to reasonableness: The agency must show that it performed a good-faith search "using methods which can be reasonably expected to produce the information requested." *Id.* It can do so with affidavits "setting forth the search terms and the type of search performed[] and averring that all files likely to contain responsive materials . . . were searched." *Id.*

Against that backdrop, revisit Aaronson's request and the FBI's search. Items 6 through 26 of Aaronson's Longbow Requests were aimed at various production companies and documentary film crews that Aaronson believes are FBI fronts. *See* Compl. ¶ 9. Number 6 is exemplary, asking for "[a]ll emails in the FBI's classified and unclassified email systems, as well as all records in the Central Records System, that mention or reference 'Longbow River Productions,' from January 1, 2020 to present." *Id.* Other items (nine in total) sought "[a]ll communications sent to the Undercover Review Committee ('UCRC') notifying it of the approval of the FBI's representing, posing, or claiming to be a member of" various supposedly fake documentary film crews. *Id.*

To fulfill Aaronson's request, the FBI perused its Central Records System ("CRS"). The CRS "is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI." Hammer

Decl. ¶ 17.  It "spans the entire FBI organization."  *Id.*  "[T]he key to locating records within the [CRS's] enormous amount of information" are the general indices, which are like "a digital version of a library card catalog."  *Id.* ¶ 19.  The general indices contain two types of entries: "main index entr[ies] . . . for each individual or non-individual (e.g., organization, event, or activity) that is the subject or focus of an investigation"; and "reference index entr[ies] [for each] individual or non-individual . . . associated with an investigation, but who or which is not the main subject or focus of the investigation."  *Id.*  Here, the FBI used specific keywords drawn from Aaronson's Longbow Requests to search both entry types across the CRS.  *Id.* ¶ 24.  After that search unearthed no responsive records, the agency closed the request.  *Id.*

Aaronson raises three objections to the search's adequacy.  *First*, he contends that the FBI unlawfully "refus[ed] to search their email systems for responsive records, even though [Aaronson] specifically requested records from such email systems."  Pl.'s Mot. Summ. J. at 26–28.  *Second*, he faults the agency for "only conducting a search of the CRS's pre-populated indices, as opposed to the full-text search that is required to identify records responsive to the Request."  *Id.* at 26, 28–30.  *Third*, Aaronson asserts that the FBI violated FOIA "by failing to search the records of the [UCRC]."  *Id.* at 26, 30–31.  Aaronson's first two complaints are misplaced, but his third has merit.  The Court takes each in turn.

**i.**

The FBI explains why it did not separately search its employees' emails in response to the Longbow Requests.  The main reason is that "a search of the CRS would include electronic communications serialized in investigative files consistent with" the agency's record management policy.  Hammer Decl. ¶ 26.  Under that policy, "FBI personnel must determine the record status for each electronic communication and import the ones that are 'nontransitory'

records into an electronic recordkeeping system."[4]  *Id.* ¶ 28.  Because the FBI's search of the

CRS's "extensive system of records" yielded no responsive records, the agency saw "no

reasonable basis to conclude that additional responsive records existed in emails at the time of

the search."  *Id.* ¶¶ 17, 26.

That explanation was enough.  FOIA does not require the FBI to turn over every stone.

*See Oglesby*, 920 F.2d at 68.  The agency's search was adequate because it "explain[ed] in its

affidavit that no other record system was likely to produce responsive documents."  *See id.*

Aaronson offers no "evidence that other databases [we]re reasonably likely to contain responsive

records."  *See Nolen v. DOJ*, 146 F. Supp. 3d 89, 97 (D.D.C. 2015).  And since the CRS search

uncovered no responsive records, the FBI was "not required to speculate about [other] potential

leads."  *See Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996).

This dispute is much like *Mobley v. CIA*, 806 F.3d 568 (D.C. Cir. 2015).  The plaintiff in

that case asked the FBI and three other agencies for records "relating principally to his detention

in Yemen."  *Id.* at 573.  In response, the FBI searched the CRS with specific keywords.  *Id.* at

581.  The plaintiff thought the search was inadequate.  In his view, the FBI "was required to

search . . . the [other] record systems he asked it to search"—as well as its email systems because

those were also "reasonably likely to contain responsive records."  *Id.* at 581–82.

---

[4]  The agency defines a "nontransitory" record as one that is "needed for more than 180 days and possesses one or more of the following characteristics: 1) contains information necessary to adequately and properly document the activities and functions of the agency; 2) provides documentation of agency decisions and commitments reached orally (person-to-person, phone, video, or in conference); 3) conveys information of value on agency activities and adds understanding of agency operations and responsibilities; 4) documents the formulation and execution of policies and decisions; or 5) provides proof of fiscal or legal rights and obligations." Hammer Decl. ¶ 28 n.10.

The D.C. Circuit rejected that argument.  Instead, the court credited the FBI's affidavit explaining "that the specific record systems [the plaintiff] asked the FBI to search either [we]re captured by the CRS or [we]re unlikely to contain responsive records." *Id.* at 581.  The agency maintained that its "e-mail systems also [we]re not reasonably likely to result in additional responsive records because the records in them [we]re redundant of records stored in the CRS." *Id.*  To the Circuit, that made the plaintiff's inadequacy claims "unpersuasive." *Id.* at 582.  As the court emphasized, "a request for an agency to search a particular record system—without more—does not invariably constitute a 'lead' that an agency must pursue." *Id.*  Instead, "a search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records." *Id.* The FBI did that here just as in *Mobley*, so its search was kosher.

Aaronson relies on *Reporters Committee for Freedom of the Press v. DOJ*, No. CV 19-2847 (TFH), 2021 WL 5179237 (D.D.C. Nov. 8, 2021), but that decision is neither binding nor analogous.  *See* Pl.'s Mot. Summ. J. at 27–28.  The plaintiff in that case made a FOIA request for documents and emails "related to the federal government's . . . questioning of freelance journalist Bryan Carmody during a law enforcement raid of his San Francisco home." *Reporters Committee*, 2021 WL 5179237, at *1.  The FBI responded with a search of the CRS indices, but the court deemed this inadequate given the case's facts.  *See id.* at *3–5.  Among other things, the court faulted the FBI for not searching its email systems or other electronic communications. *Id.* at *4.  As the court highlighted, the plaintiff had already obtained from the San Francisco Police Department "a number of responsive emails sent from the FBI email accounts of FBI Special Agents"—including "emails explicitly referenc[ing] Carmody by name in the subject line." *Id.*  Only against that backdrop of unmistakable leads did the court conclude that "an

index-only search of solely the CRS" did not amount to "a good faith effort to conduct a search for the requested records." *Id.*

*Reporters Committee* echoes the longstanding maxim that an agency must follow up on leads. *See Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998) ("An agency has discretion to conduct a standard search in response to a general request, but it must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry."). But that principle does not help Aaronson. The FBI's CRS search came up empty; there were no leads to pursue. In this light, the agency reasonably concluded that the email systems were unlikely to harbor anything else. *See Mobley*, 806 F.3d at 582.

**ii.**

The same logic applies to the FBI's decision to forgo a full-text CRS search. The Longbow Requests sought records about various supposedly FBI-controlled production companies and crews, including "Longbow River Productions," "Eagle Way Entertainment," and "Lionsheart Productions." Compl. ¶ 9. The FBI thought that those "subjects [we]re reasonably expected to be indexed within the automated indices of the CRS" because it compiles information "by individual (person) [and] organization (entity, place, or thing)." Hammer Decl. ¶¶ 16, 19. After the CRS index search proved unfruitful, the FBI delved no further. *Id.* ¶ 24.

That justification passes muster. Given the kind of information that Aaronson sought, the FBI's search was "reasonably calculated to uncover all relevant documents." *See Truitt*, 897 F.2d at 542 (cleaned up). As with the email systems, the FBI "has sufficiently explained its search process" and why a full-text CRS search was "not reasonably likely" to unearth responsive records. *See Mobley*, 806 F.3d at 582.

Aaronson's bid for a full-text search is nothing new. The Court has seen—and rejected—a similar demand before. In *Callimachi v. FBI*, 583 F. Supp. 3d 70 (D.D.C. 2022), the plaintiff requested records about her stepfather Mihail Botez, a former Romanian ambassador to the United States. *Id.* at 77–78. The FBI searched the CRS indices, which "yielded 171 pages of responsive documents." *Id.* at 84. The plaintiff was unsatisfied, contending "that the FBI should have conducted a full-text search." *Id.* at 85.

This Court disagreed. It noted that "the CRS is where the FBI indexes information about *individuals*, organizations, events, and other subjects." *Id.* at 84 (cleaned up). "Because Botez was an individual, a search of those indices would be reasonably calculated to locate all FBI records pertaining to him." *Id.* (cleaned up). The plaintiff failed to overcome this adequacy showing; she gave no reason to surmise "that a full-text search [wa]s reasonably likely to unearth more records." *Id.* at 85. The search was thus adequate. *Id.* at 84; *accord Cunningham v. DOJ*, 40 F. Supp. 3d 71, 85 (D.D.C. 2014) (greenlighting FBI's CRS index search for records about an individual). That holds true here, too.

### iii.

Aaronson's third argument has merit. Several Longbow Requests asked specifically for "[a]ll communications sent to the Undercover Review Committee ('UCRC') notifying it of the approval of the FBI's representing, posing, or claiming to be a member of" various documentary film crews. Compl. ¶ 9. Aaronson contends that the FBI unlawfully ignored those demands when it searched only the CRS. Pl.'s Mot. Summ. J. at 30–31.

The agency is noticeably curt in its response. Its declaration states merely that, like the emails, the UCRC communications "are reasonably expected to be indexed within the automated

indices of the CRS."  Hammer Decl. ¶ 16.  Aside from gesturing to the CRS's "comprehensive

nature," the FBI leaves the reader guessing why.  *See id.*

That will not do.  As the D.C. Circuit has long emphasized, an agency "cannot limit its

search to only one record system if there are others that are likely to turn up the information

requested."  *Oglesby*, 920 F.2d at 68.  The *Oglesby* court invoked that principle in ruling that the

State Department's search was inadequate.  *Id.* at 71.  In the Circuit's eyes, the agency's affidavit

did not make clear "that the Central Records system [wa]s the *only* possible place that responsive

records [we]re likely to be located."  *Id.* at 68.  "At the very least, State was required to

explain . . . that no other record system was likely to produce responsive documents."  *Id.*; *see*

*also Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (reversing grant

of summary judgment for agency where "a review of the record raise[d] substantial doubt" about

the search's adequacy, "particularly in view of well defined requests and positive indications of

overlooked materials" (cleaned up)); *Jett v. FBI*, 139 F. Supp. 3d 352, 368 (D.D.C. 2015)

(concluding that a CRS-only search was inadequate where "the need to search the [Electronic

Surveillance Indices] system was plain on the face of [plaintiff's] FOIA request").

*Mobley* is instructive yet again.  While that decision helped the FBI on Aaronson's first

two complaints, it cuts against the agency here.  To repeat, the *Mobley* court ruled that "a search

is generally adequate where the agency has sufficiently explained its search process and why the

specified record systems are not reasonably likely to contain responsive records."  806 F.3d

at 582.  At the same time, the Circuit underlined that "an agency may not ignore a request to

search specific record systems when a request reaches the agency before it has completed its

search."  *Id.*  That is what the FBI did for the UCRC communications.  The agency's *ipse dixit*

does not justify its decision to skip over those files.  *See SafeCard Servs.*, 926 F.2d at 1200 ("In

15

order to establish the adequacy of a search, agency affidavits must be . . . relatively detailed and non-conclusory . . . ." (cleaned up)).  The Court thus rules for Aaronson—but only on the last adequacy issue.

**C.**

Turn now to *Glomar*.  In items 5, 27, and 28 of the Longbow Requests, Aaronson sought all mentions of the name "Brent Tyler," as well as records involving an email address and phone number.  Compl. ¶ 9.  Aaronson asserts that "Brent Tyler" is "a pseudonym for a member of the FBI," *id.*, and that the FBI controls the email address and phone number associated with that name, *see* Pl.'s Statement of Material Facts, ECF No. 16-2, ¶ 25.  Rather than searching for responsive records, the FBI invoked *Glomar*, contending "that merely acknowledging the existence or non-existence of records responsive" to those items "would trigger harm under FOIA Exemptions 6 and 7(C)."  Hammer Decl. ¶ 38.  Aaronson argues that the agency's *Glomar* response was improper because a pseudonym does not implicate the relevant FOIA exemptions' privacy concerns.  Pl.'s Mot. Summ. J. at 31–36.  Because the FBI does not dispute that "Brent Tyler" is a pseudonym, the Court agrees with Aaronson.

FOIA sets forth nine exemptions to its otherwise broad disclosure mandate.  5 U.S.C. § 552(b).  In some cases, "the fact of the existence or nonexistence of agency records falls within a FOIA exemption."  *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).  This is where the agency may provide a *Glomar* response—"refus[ing] to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a[] FOIA exception."  *Id.* (cleaned up).  When reviewing such a response, courts "apply the general exemption review standards established in non-*Glomar* cases."  *Knight First Amend. Inst. at Columbia Univ. v.*

16

*CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021) (cleaned up).  The agency thus bears the burden to

justify its *Glomar* response.  5 U.S.C. § 552(a)(4)(B).

Exemptions 6 and 7(C) both deal with privacy.  Exemption 6 applies to "personnel and

medical files and similar files the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy." *Id.* § 552(b)(6).  Exemption 7(C) protects "records or information

compiled for law enforcement purposes, but only to the extent that the production of such law

enforcement records or information . . . could reasonably be expected to constitute an

unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).  Because "Exemption 7(C) is

more protective of privacy than Exemption 6," the Court "need only consider whether [the FBI]

properly invoked Exemption 7(C)." *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011).  "To meet its

burden of establishing that Exemption 7(C) applies, the agency must demonstrate that

(1) disclosure could reasonably be expected to constitute an unwarranted invasion of privacy and

(2) the personal privacy interest is not outweighed by the public interest in disclosure." *Elec.*

*Priv. Info. Ctr. v. DOJ*, 18 F.4th 712, 718 (D.C. Cir. 2021) (cleaned up).

Aaronson asserts that "Brent Tyler" is a pseudonym for an undercover FBI agent.  Pl.'s

Statement of Material Facts ¶¶ 55–56.  He offers various facts supporting that belief, including

that "Brent Tyler" has no Internet presence tying him to the film industry and that the phone

number "Brent Tyler" provided in email correspondence with a gun rights advocate was later

disconnected. *Id.* ¶¶ 49–51.  The FBI never disputes that "Brent Tyler" is a pseudonym, nor does

it challenge any of Aaronson's evidence. *See, e.g.*, Hammer Decl. ¶ 38 (stating, without

disputing, that Aaronson "alleges [that 'Brent Tyler'] is a pseudonym for a member of the FBI");

Defs.' Mot. Summ. J. at 18 (contending that *Glomar* response was appropriate because

Aaronson's requests "were in regard to one or more third parties").  For the agency, that evasion

17

comes at the cost of admitting—for summary-judgment purposes—that "Brent Tyler" is a

pseudonym. *See* LCvR 7(h)(1) ("In determining a motion for summary judgment, the Court may

assume that facts identified by the moving party in its statement of material facts are admitted,

unless such a fact is controverted in the statement of genuine issues filed in opposition to the

motion.").

The FBI's admission makes its *Glomar* response falter at prong one. It means that the

agency has not established that any *person's* privacy is at stake. *See* 5 U.S.C. § 552(b)(7)(C)

(exempting information that would cause an "invasion of *personal* privacy" (emphasis added)).

After all, a pseudonym shields a person's true identity. Disclosing the bare fact that "Brent

Tyler" is a pseudonym thus would not expose any individual to "the stigma potentially

associated with law enforcement investigations." *See Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir.

1984) (cleaned up). Nor would it subject any person to "rumor and innuendo" or otherwise

cause "serious damage to [anyone's] reputation[]." *See id.* (cleaned up); *see also, e.g.*, *Reps.*

*Comm. for Freedom of Press v. FBI*, No. CV 17-1701 (RC), 2022 WL 13840088, at \*4 (D.D.C.

Oct. 21, 2022) (holding that "Exemption 7(C) d[id] not justify the FBI's withholding of

pseudonyms" and ordering the agency to "release all pseudonyms in the 54 pages of

records"), *on reconsideration*, 754 F. Supp. 3d 56 (D.D.C. 2024).

Nor does the FBI successfully invoke any other FOIA exemption. It submits a second

affidavit that gestures toward other FOIA carveouts that "provide justification for the FBI's

standard position to neither confirm nor deny the existence of unacknowledged records." Second

Hammer Decl., ECF No. 15-3, Ex. N ¶ 4. But neither the affidavit nor the agency's briefing

properly develops the argument for any of the non-privacy exemptions. The FBI does not, for

instance, argue that protection of sensitive law enforcement techniques justifies its *Glomar*

response. *See* 5 U.S.C. § 552(b)(7). So the agency forfeits any such arguments. *See, e.g.,*
*United States v. McGill*, 815 F.3d 846, 909 (D.C. Cir. 2016) (per curiam) ("[W]oefully
undeveloped arguments are forfeited . . . ."). The Court thus holds that the FBI improperly gave
a *Glomar* response to items 5, 27, and 28 of Aaronson's Longbow Requests.

**D.**

There is one more loose end. Aaronson maintains that the FBI might have invoked a
FOIA exclusion in responding to his request. Pl.'s Mot. Summ. J. at 38–40. FOIA's three
exclusions "permit the government to treat requests for records as falling outside the scope of the
statute altogether." *Memphis Pub. Co. v. FBI*, 879 F. Supp. 2d 1, 7 (D.D.C. 2012); *see* 5 U.S.C.
§ 552(c)(1)–(3) (listing the three exclusions). "In other words, an agency applying an exclusion
will respond to the request as if the excluded records did not exist." *Memphis Pub. Co.*, 879 F.
Supp. 2d at 7 (cleaned up). Aaronson suspects that the FBI might have done so here because the
agency told him that "it was unable to identify records *subject to the FOIA* that [we]re responsive
to the request." Hammer Decl. ¶ 9 (emphasis added); *see* Pl.'s Mot. Summ. J. at 39. He asserts
that any FOIA exclusion would be improper—more specifically, that the first exclusion does not
apply because his request does not implicate any investigation where the FBI has "reason to
believe that . . . the subject of the investigation . . . is not aware of its pendency." *See* 5 U.S.C.
§ 552(c)(1); Pl.'s Mot. Summ. J. at 39.

In cases where "a FOIA plaintiff raises a distinct claim regarding the suspected use of an
exclusion," the FBI "routinely will submit an *in camera* declaration addressing that claim, one
way or the other." *See* Attorney General's Memorandum on the 1986 Amendments to the
Freedom of Information Act (Dec. 1987), https://perma.cc/JNA3-SMCZ; *see also, e.g., Labow v.*
*DOJ*, 831 F.3d 523, 533 (D.C. Cir. 2016) ("[T]he district court, adhering to standard FBI practice

19

when confronting a challenge to the suspected use of the exclusion at issue here, reviewed an ex parte FBI affidavit in camera to determine whether the exclusion had in fact been applied, and, if so, whether its application was appropriate."). The FBI has done so here. Having reviewed that declaration along with the remaining record, the Court concludes that, if an exclusion was employed, it was and remains amply justified.

## IV.

In sum, the Court holds:

- that the FBI performed an adequate search in response to the Contract Requests;

- that Aaronson's Getwitz Requests were unduly burdensome and did not merit a search;

- that the FBI's search as to items 6 through 26 of the Longbow Requests was adequate over Aaronson's objections to the agency's refusal to separately search the email systems and to run a full-text search;

- that the FBI's search as to items 6 through 26 was inadequate due to the FBI's refusal to search the UCRC communications;

- that the FBI improperly invoked *Glomar* in responding to items 5, 27, and 28 of Aaronson's requests; and

- that, if a FOIA exclusion was employed, it was and remains amply justified.

Where the FBI failed to provide Aaronson the documents he was due as outlined above, it must now produce them. A separate Order will issue today.

Dated: February 20, 2026

TREVOR N. McFADDEN
United States District Judge

20